# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

AMANDA DUCKSWORTH,    )
                              )
    Plaintiff,          )
                              )     Case Number:
v.                         )     2:16-cv-01234-JEO
                              )
STRAYER UNIVERSITY, INC.    )
                              )
    Defendant.      )

## <u>MEMORANDUM OPINION</u>

This is an employment discrimination case.  In it, the Plaintiff, Dr. Amanda Ducksworth, claims that her former employer, Defendant Strayer University, Inc. ("Strayer") is liable under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981 for unlawful race discrimination and retaliation in the termination of her employment.  (Doc.[1] 1). The cause now comes to be heard on Strayer's motion for summary judgment. (Doc. 62).  Upon consideration, the court[2] concludes that the motion is due to be granted.

---

[1] References to "Doc(s) ___" are to the document number(s) of the pleadings, motions, and other materials in the court file, as compiled and designated on the docket sheet by the clerk.  Unless otherwise noted, pinpoint citations are to the page of the electronically-filed document in the court's CM/ECF filing system, which may not correspond to pagination on the original "hard copy" presented for filing.

[2] The parties have consented to an exercise of plenary jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c) and Rule 73, Fed. R. Civ. P.  (Doc. 27).

## I. SUMMARY JUDGMENT STANDARDS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a defendant is authorized to move for summary judgment on the claims asserted against it.  Under that rule, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(a).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show there is a genuine issue for trial.  *Celotex Corp.*, 477 U.S. at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. Proc. 56(c)(1)(A), (B).  In its review of the evidence, a court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor.

*Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000). At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## II. BACKGROUND[3]

Plaintiff is African-American. In 2012, she began working for Strayer, a corporation that operates Strayer University, a private, for-profit education institution with campuses throughout the country. In late January 2014, she was promoted to Campus Dean of Strayer's campus in Huntsville, Alabama. Initially, her supervisors were Dr. Ulysses Weakley and Dr. Kimberly Pierre, both of whom are also African-American. In April 2015, Dr. Ronna Campbell, who is white, assumed responsibility over Strayer's Georgia-Alabama-Louisiana region that included the Huntsville campus and thereby became Plaintiff's supervisor. Dr. Campbell, in turn, reported to Strayer's Senior Vice Provost, Chandra Quaye, who is African-American. Plaintiff's claims in this action focus on her discharge, which occurred on September 3, 2015, when Quaye, acting on a recommendation

---

[3] The summary in this background section is taken from the court's review of the pleadings where uncontested and from the evidentiary materials in the court file. While the parties dispute many of the facts, as required by the applicable standard of review at summary judgment, the evidence is presented here in the light most favorable to Plaintiff as the non-movant, with reasonable inferences drawn in her favor. Accordingly, these are the facts for purposes of the instant motions only; they may not be the actual facts.

from Dr. Campbell, approved the termination of Plaintiff's employment for alleged job deficiencies and misconduct.

Plaintiff's performance review for 2014, her first year as Campus Dean, was completed before Dr. Campbell became her supervisor. On that review, Plaintiff received an overall score of "7" out of a possible "10," translating to a "good performer" who "frequently meets expectations." (*See* Doc. 63-22 at 9). Plaintiff suggests that rating was "very high[ ]." (Doc.65 at 3). However, it was not, in fact, particularly so as compared to those of her peers, as seen in a ranking that Quaye prepared in the spring of 2015 of the deans of the Strayer campuses. (Doc. 63-12). Plaintiff's 2014 supervisor review score left her in a six-way tie for 59th out of 82 Strayer campus deans nationwide, and Quaye ultimately ranked Plaintiff 66th overall, placing her in the bottom 20%. (*Id.*)

While Plaintiff says she had a good relationship with Drs. Weakley and Pierre, she acknowledges her dealings with Dr. Campbell were rockier. Generally speaking, Plaintiff perceived Dr. Campbell to be "hostile" and "intimidating" in their interactions, based on her "tone," "facial expressions," and "choice of words." choice." (Doc. 63-11, Plaintiff's Deposition ("Pl. Dep.") at 110-11). Plaintiff does not claim, however, that Dr. Campbell ever used language referring to race. Nevertheless, Plaintiff believes that Dr. Campbell did not like working with her and that, when Dr. Campbell wanted to discuss matters related to the Huntsville

Campus, she eventually would instead consistently communicate with its Campus Director, Julie Pryor, who ran the operations side of campus administration and who, like Dr. Campbell, is white.

Soon after taking over as Plaintiff's boss, Dr. Campbell indicated in a number of emails with Plaintiff that she had issues with Plaintiff's understanding of Strayer's academic policies, procedures, and records system in various respects. The first of these appears to have been related to an exchange on April 10, 2015. There, Plaintiff sent an email to Dr. Campbell for the purpose of "giving [her] a heads up" that Plaintiff would be sending her thirteen "change of attendance cases" because a marketing instructor had submitted attendance incorrectly for a night class. (Doc. 63-18). Campbell was confused by Plaintiff's missive, to which she responded, "Was this a class last term? Why would we be processing cases now?" (*Id.*) This was because, according to Dr. Campbell, the attendance changes did not require her approval at all, per instructions on the applicable form itself. (Doc. 63-13, Campbell Declaration ("Campbell Decl.") ¶ 5(G). Plaintiff was unable to identify any policy contrary to Dr. Campbell's claimed understanding that her approval was not actually required in that instance, although Plaintiff further suggests that this episode was example of where the applicable policy had changed. (Pl. Dep. at 304-08, 425).

A few days later, on April 15, 2015, Dr. Campbell advised Plaintiff that Strayer's records system indicated that there was a serious lack of required "advising" of "at risk" students at the Huntsville Campus for the winter term, a function to be overseen by Plaintiff as the campus dean. (Doc. 63-5). That email included a chart showing that, for the other ten campuses in the region, there were a total of 2,305 documented "at risk" students, all but 4 of whom had been advised as required. By contrast, the Huntsville Campus had 100 "at risk students," 47 of whom had not been advised. (*Id.*) Plaintiff replied that it was her understanding that all at-risk students on the Huntsville Campus had, in fact, been advised. (*Id.*) Plaintiff further offered that she would have to run the report to understand what had happened, though she suggested that the adjunct faculty members retained to do advising might have erred in entering the required data. (*Id.*) Dr. Campbell later opined that Plaintiff had failed to keep up with the issue because she "was not posting comments as required" in the system. (Campbell Decl. ¶ 5(F)). For her part, Plaintiff acknowledges that she was not aware of any documented deficiency prior to Dr. Campbell's email because she had not run the relevant report on the system. However, Plaintiff claims that the students were, in fact, properly advised, but her faculty had not entered the proper information and coding in the system. (Pl. Dep. at 408-12).

On April 27, 2015, Dr. Campbell sent another email to Plaintiff, requesting that she "advise ASAP" on a student grade change that appeared to be weeks overdue for processing and asking Plaintiff whether she had submitted a "case" for the change. (Doc. 63-20). Plaintiff answered that she had not, stating simply that she was waiting on a response from the class instructor. (*Id.*) Dr. Campbell, however, claims that Plaintiff was dilatory in failing to follow up with the instructor for several weeks, as well as by failing to timely close the matter for several days after being contacted by student affairs, thus requiring Dr. Campbell to become involved. (*See id.*; Campbell Decl. ¶ 5(I)). When asked about the episode, Plaintiff was unable to recall details, although she believed she had taken appropriate action by contacting the instructor and waiting on his response. (Pl. Dep. at 310-15).

One month later, Dr. Campbell sent an email to Plaintiff asking why a certain class at the Huntsville campus had been reopened despite not having the required minimum student enrollment. (Doc. 63-13). Specifically, Dr. Campbell noted that all classes with less than five students were to have been removed from the schedule by the preceding week, while the class at issue had only three students and had been reopened without prior approval from her or from scheduling. (*Id.*; *see also* Campbell Decl. ¶ 5(H)). Plaintiff responded to the email by expressly taking "responsibility" for having reopened the class, explaining that she and Pryor

had discussed "how critical the class was for new students," so she "took the risk of making the class available … rather than having to turn students away for the summer because [they] did not have enough first level classes on schedule for the summer." (*Id.*) Plaintiff does not dispute that under Strayer policy, she could not reopen the class without first getting approval because it did not have the minimum number of students (Pl. Dep. at 319), although she suggests that Dr. Campbell "may not have had all the information" about the class at the time she sent her email. (*Id.* at 317).

Two days later, on May 29, 2015, Dr. Campbell sent Plaintiff another email, this time regarding expense reports more than 90 days old. (Campbell Decl. ¶ 5(J)); Pl. Dep. at 428-29). To that, Plaintiff explained that she "generally" submitted her expense reports on time. (Pl. Dep. at 428-29). However, she also acknowledges that "there may have been some" that she did not, because, she says, "there were several things going on with [her] having been out of the office." (*Id.*)

On Monday, June 1, 2015, Strayer received a complaint about Plaintiff from Jessica Jackson, an African-American woman working in the student final aid office at the Huntsville campus. (*See* Doc. 63-3; Doc. 63-13 at 14-16). Jackson there related that she had received a text message the day before in which Plaintiff, to whom she did not report, had essentially told Jackson she was acting unprofessionally and warned that she was putting her job at risk by challenging

Pryor's authority as campus director. Jackson apparently took the text message as inappropriate and interpreted it as having threatened her employment. A representative of Strayer's Human Resources Department investigated Jackson's complaint and called Plaintiff. With Dr. Campbell participating in the interview, Plaintiff initially denied having sent the text message to Jackson. Thereafter, however, Plaintiff admitted that she had, in fact, sent it. (*See* Pl. Dep. at 339-53). On July 9, 2015, Dr. Campbell traveled to the Huntsville campus and met with Plaintiff to discuss several alleged performance issues. (*See* Doc. 63-3; Doc. 63-13 at 14-16). That meeting was conceived in part specifically to address Plaintiff's text message to Jackson. (*Id.*) Dr. Campbell thereafter criticized Plaintiff for not being "forthcoming regarding the text message" and recognized that "conveying information to an employee regarding their job performance/conduct via text message is not appropriate, regardless of [her] relationship with an employee." (Doc. 63-3). Plaintiff further acknowledges that, in their discussion, Dr. Campbell indicated that Plaintiff's dishonesty had been a breach of loyalty, going so far as to tell Plaintiff, "When you've done something like that, your time is up." (Pl. Dep. at 350-51).

At the meeting on July 9th, Dr. Campbell also addressed another issue again involving Jackson. On June 30, 2015, Jackson had sent a group email to the other members of the Huntsville campus administration team, comprised of Plaintiff,

Pryor, Admissions Officers Hayes and Bartlett, Campus Coordinator Shana Upton, and Librarian Dennis Borden. (Doc. 63-10). Jackson asked the recipients how they would feel about participating in a "short team building exercise" at their daily "stand up" meeting, based on an exercise Jackson had done with her team a few years earlier. (*Id*.) Plaintiff responded with a "reply all" email, telling Jackson that while her idea was "commendable," "[t]eam building exercises require time, planning, and respect for all team members." (*Id.*) Plaintiff concluded her response by rejecting Jackson's suggestion, stating, "It is more appropriate for the Campus Dean or the Campus Director to lead the campus in effective team building." (*Id.*) Upon reviewing the situation, however, Dr. Campbell told Plaintiff she was displeased with her response. Dr. Campbell conveyed, rather, that she believed Jackson was showing initiative and that Plaintiff had effectively chastised her for it in front of all team members, thereby "undermin[ing] the hard work underway in building a collaborative, innovative culture where everyone is encouraged to contribute." (Doc. 63-3 at 3).

Dr. Campbell also told Plaintiff during the meeting that, based on her attendance at a campus meeting and feedback from the Huntsville administration team, Dr. Campbell believed they were not responding positively to Plaintiff's leadership and did not respect or like working with her. (*Id.*) According to Plaintiff, Dr. Campbell first told her that Teri Jaggers, a Strayer regional operations

manager and a white female, had related seeing Upton, the Campus Coordinator and also a white female, roll her eyes when Plaintiff was speaking at a meeting. Dr. Campbell also related that the two Admissions Officers, Hayes and Bartlett, both of whom are African-American, felt like Plaintiff "talked down" to them. (Pl. Dep. at 45-47, 80, 84-85).

According to Plaintiff's summary judgment affidavit, at their on-campus meeting on July 9th, she complained to Dr. Campbell about what she believed was an instance of employment discrimination based on race. Specifically, Plaintiff claims in her affidavit that she "explicitly" raised "concerns" that the promotion of Pryor to the Campus Director position earlier that spring had been racially discriminatory and had been at the expense of other more qualified potential candidates, including Admissions Officer Bartlett. (Doc. 65-1, Plaintiff's Affidavit "Pl. Aff.") ¶ 10). As discussed later herein, Strayer has moved to strike that testimony, arguing that it contradicts Plaintiff's earlier sworn statements in her deposition. And for her part, Dr. Campbell denies that Plaintiff raised any complaints or concerns at the July 9th meeting about Pryor's selection, whether in relation to race discrimination or otherwise. (*See* Doc. 63-13, Campbell Aff., ¶¶ 10-16).

In any event, on July 13, 2015, Dr. Campbell sent a follow up email to Plaintiff. (Doc. 63-3 at 2-3). In it, Dr. Campbell referenced the meeting and

reiterated that she was "concerned about [Plaintiff's] management judgement [sic] and leadership." In it, Dr. Campbell makes no acknowledgement that Plaintiff had raised concerns about race discrimination generally or as it might relate to Pryor's selection specifically. Rather, Dr. Campbell recited her disappointment with Plaintiff's text message to Jackson and her subsequent dishonesty about having sent it, as well as with Plaintiff's discouraging email response to Jackson's proposed team-building exercise. Dr. Campbell also stated her perception that Huntsville administration team members did not like working with Plaintiff. Finally, Dr. Campbell's email concluded:

> The Campus Dean serves as Senior Academic Officer at a designated Strayer University campus location and is responsible for ensuring academic quality at that campus in cooperation with the Campus Director. It is expected that you take a lead in creating a positive culture at the Huntsville Campus. In addition, it is critical that you work collaboratively with the Campus Director, Student Financial Services and Student Academic Services to develop a team that fosters growth and accountability.

> Further concerns regarding your leadership of the campus will result in removal from the Campus Dean role.

(Doc. 63-3 at 3).

Several hours later, Plaintiff sent Dr. Campbell a reply email, attaching a three-page, single-spaced letter in which Plaintiff sought to defend her actions and record as Campus Dean. (Doc. 63-3 at 4-6). In a section of the letter, Plaintiff addressed her interactions with Hayes and Bartlett, who Dr. Campbell had

identified as having expressed that Plaintiff "talked down" to them. In responding,

Plaintiff never mentioned race, although she did touch on Pryor's hire as Campus

Director, as follows:

> The current admissions pilot process requires minimal interaction
> with the Admissions Officers (AOs). The AOs bring new students
> to my office to meet me when they interview on campus. Julie
> Pryor, Justin Bartlett, and Ken[a] Hayes, are always responsive and
> professional in their interaction with me. When I notice awkward
> statements from Justin or Kena at our daily standup/huddle
> meetings, I inquired with Julie. Julie has explained Justin feels like
> he has been treated unfairly and he is trying to leave. According to
> Julie, her assignment to the Campus Director position without
> consideration of other candidates created tension on her team.
> Members of her team have expressed concerns to me of what they
> perceived as unfair and bias. As students and employees some
> expressed concerns about being allowed to complete the NPS [Net
> Promoter Scores] survey with their honest views. As a result of
> these factors, tensions are high in Admissions, morale is down, and
> team members have a negative view of how decisions are made. It
> is my understanding that Julie Pryor and Teri Jaggers are addressing
> these concerns.

(Doc. 63-3 at 3).

About two weeks later, on July 24, 2015, Dr. Campbell completed Plaintiff's 2015

mid-year performance review. (Doc. 63-22). It was not a favorable one, to say the least.

Whereas Plaintiff last supervisor had given her an overall score of 7 out of 10 on her

2014 evaluation, Dr. Campbell's mid-year 2015 review yielded an overall score of just

2.9. That put Plaintiff at the bottom of nine campus deans Dr. Campbell rated at the time,

whose average score, without Plaintiff, was 6.8. (Doc. 63-7). It appears that Dr.

Campbell presented the evaluation to Plaintiff and reviewed it with her at an on-campus

meeting on or about August 4, 2015. In the comments section of the evaluation, Dr.

Campbell included the following remarks on her ratings for Plaintiff:

> Overall Dr. Ducksworth's key strength is her care and concern for her students and the campus NPS scores in 2015 reflect her strong student customer service focus. The key areas of opportunity are in knowledge and systems proficiency and in leadership. Both are areas of serious concern needing rapid improvement.
>
> SMART Goal 1 [Customer Service, rating: 7]: Overall good and NPS [Net Promotor Score][4] is key area of strength. Case handling accuracy and responsiveness to other stakeholders are key areas of opportunity.
>
> SMART Goal 2 [Academic Excellence, rating 3]: Improvement needed as bottom 10% scores for individual teaching dashboard results in 2015. Transferring knowledge and proficiency is another area of opportunity for improvement.
>
> SMART Goal 3 [Advising and Scheduling, rating: 2]: Improvement has been required in this area. For example midterm at risk advising was not completed for winter term. New student advising comment entry was not handled appropriately and faculty assisting with advising had not been properly trained.
>
> SMART Goal 4 [Policies, Procedures, and Reporting, rating: 2]: Satisfactory audit rating in winter for academics. Rapid improvement is needed in mastering policy and systems knowledge to support academic compliance. Examples include handling of attendance changes, policy requirements regarding BUS508 for MBA students, and appropriate course sequencing. The tutoring and advising budget has not been consistently met in 2015.
>
> SMART Goal 5 [Growth and Support Activities, rating: 5]: Solid support activities have been held at the campus for this area. The campus is struggling with growth and is one of few campuses in the

---

[4] "NPS or "Net Promoter Score," is a measure derived from student satisfaction survey ratings. (*See* Pl. Dep. at 29-31, 173-74, 239).

region that is declining in population so the right type of activities are
needed to assist with growth efforts.

Leadership Behaviors [ratings: 2]: Dr. Ducksworth's leadership is
undermining the building of the innovative collaborative culture
needed at the campus. Feedback received from campus staff and from
leadership reflects that the Huntsville team is not responding in a
positive manner to her leadership and feel that she talks down to them.
Integrity has been questioned with the text messaging issue with a
staff member and it is apparent that she is not providing much needed
inspiration for the team.

(Doc. 63-22 at 8 (bracketed material and footnote added); *see also id.* at 4; Doc. 63-8).

On August 17, 2015, Dr. Campbell sent an email to Chandra Quaye

recommending Plaintiff's termination.  (Doc. 63-6).  In support, Dr. Campbell

cited the following "performance and leadership concerns" and attaching related

documentation:

• Performance Review, overall rating of 2.9, the lowest of all Dean
reviews in Onsite and GALA regions.

• Faculty Dashboard, reflects SOP scores in bottom 10% for winter
and spring term classes taught.

• Notes for midyear review, includes the summary comments
included in the midyear appraisal. ….

• A [Memorandum of Understanding] was drafted in early July due
to serious leadership and integrity concerns. HR advised handling via
email instead and the email to document the July 9 discussion and
Amanda's response are attached. Amanda was asked to reflect and
then identify her plan of action to address the serious concerns but her
response was defensive and did not provide her plan to address the
concerns.

• Email Amanda sent to a staff member at the campus on June 30. The staff member had shown initiative in recommending a team building exercise and Amanda copied the entire Huntsville team on her response in which she exerted authority and essentially discouraged employees making suggestions. This is an example of the behaviors that are counter to the culture we are trying to foster at the campus.

• April 15[, 2015] email regarding the concerns with advising at the campus. Amanda was not posting comments as required in the advising dashboard and not only was midterm at risk advising not done for winter, she did not know it had not been done until I brought it to her attention.

• Change of attendance Email from April 2015 which is an example of Amanda not understanding some basic requirements and an example of her lack of resourcefulness. She was planning to send me 13 cases for approval of current term attendance corrections which did not require my approval per instructions on the attendance change form.

• May 28, 2015 email regarding the reopening of a low enrollment class that had been placed in stop further enrollment by scheduling. She reopened the class without prior approval from me or scheduling.

• April 27[, 2015] email regarding a sit in grade change that had not been processed and required several follow-up attempts by student affairs and ultimately my involvement before she responded to the original sit in grade change instructions that had been sent to her by Rich Lamptey almost a month before.

• Email from May 29[, 2015] regarding expense reports more than 90 days old.

More recently, while at the Huntsville campus on August 4 for the midyear review discussion and the Huntsville campus audit, Susie Hendricks provided feedback that Amanda's behavior was different after I arrived at the campus. She indicated that Amanda has been rude and unapproachable while she has been at the campus without

leadership present. There was also an audit finding related to a SAP student that could have been avoided if Amanda had been monitoring the developmental education reports as required. Amanda did not know how to find or run the development education reports in Cognos. A student was allowed to attend a third term and take college level classes despite not having satisfied the 090 requirements. The student had failed all classes taken at Strayer, had not satisfied the 090 requirements, and was enrolled in three college level classes for summer term. This finding resulted in OFI [Opportunity For Improvement, *i.e.*, unsatisfactory] for the SAS [Student Academic Services] section of the audit.

(Doc. 63-6).

Later, during the last week of August 2015, Plaintiff was on the receiving end of an email Dr. Campbell sent to four or five campus deans in the region, advising that she would be visiting their respective campuses in the following week. (*See* Pl. Dep. 218-222). Plaintiff was uneasy at that prospect, given both that the email did not identify an agenda and the negative feedback she had been receiving from Dr. Campbell. But by September 3, 2015, the date of Dr. Campbell's scheduled visit to the Huntsville campus, Plaintiff's uncertainty had turned to alarm, as she had since been told that, Dr. Campbell had been firing deans ahead of Plaintiff on the email list when she had visited their campuses. That prompted Plaintiff to contact Strayer's Human Resources Department via email, complaining that she was being "harassed and bullied" by Dr. Campbell. (Doc. 1 at 13). In the end, however, it did not help; when Dr. Campbell arrived at

the Huntsville campus, she met with Plaintiff and told her that employment was terminated.

Plaintiff filed an administrative charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Doc. 1 at 13-14). After receiving a right-to-sue notice from the EEOC dismissing her charge (*id*. at 16), Plaintiff filed this action in July 2016, against Strayer, as well as Dr. Campbell and Jaggers individually (collectively "Defendants"). (Doc. 1). At that time, Plaintiff was acting *pro se*. In February 2017, she filed two pleadings that the court advised it would consolidate and treat as an amended complaint, and the court ordered service. (Docs. 8, 9, 10). The Defendants appeared, and on December 2017, the court granted in part and denied in part their partial motion to dismiss. (Docs. 18, 19, 31). In January 2018, an attorney, Ida Tyree-Hyche, appeared in the action on Plaintiff's behalf. (Doc. 36). Thereafter, the parties filed a joint motion to dismiss Dr. Campbell and Jaggers as defendants, which the court granted. (Docs. 39, 40). On August 20, 2018, Attorney Tree-Hyche was granted leave to withdraw. (Docs. 49, 50, 51). A week later, a new attorney filed a notice of appearance on Plaintiff's behalf, Paul Harmann Rand. (Doc. 52).

In September 2018, Strayer filed its instant motion for summary judgment on all remaining claims, by which Plaintiff alleges that Strayer is liable for having terminated her employment because of race and for complaining about race

discrimination. (Doc. 62). The parties have fully briefed the motion (Docs. 64, 65, 66, 67-1, 69), and they have also filed evidence in support of their respective positions. (Docs. 63, 65). The motion is thus ripe for decision.

## III. DISCUSSION

### A. Racially Discriminatory Discharge

Plaintiff first claims that Strayer is liable on the theory that it terminated her employment because of race. These claims are brought pursuant to both Title VII and 42 U.S.C. § 1981. In relevant part, Title VII makes it an "unlawful employment practice" for an employer to "discharge … or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Section 1981, in turn, gives "all persons the same right to make and enforce contracts as is enjoyed by white citizens." 42 U.S.C. § 1981(a). For purposes of the statute, "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Section 1981 thus prohibits a range of material adverse actions in private employment because of race, including discharge. *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 450-51, 454-55 (2008). In this circuit, Title VII and § 1981 claims alleging racially discriminatory

discharge are treated as parallel causes of action with the same substantive standards of liability and proof. *Bryant v. Jones*, 575 F.3d 1281, 1296 n. 20 (11th Cir. 2009). Accordingly, the court will treat Plaintiff's Title VII and § 1981 discrimination claims based on her discharge[5] with a unified analysis. *See id.*

Plaintiff concedes she lacks direct evidence that she was fired because of race. (Doc. 65 at 27 n. 21). Rather, she tries to make out her claim relying upon circumstantial evidence. Therefore, Plaintiff's claims related to her discharge are due to be analyzed at summary judgment under the familiar, burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Trask v. Secretary, Dep't of Veterans Affairs*, 822 F.3d 1179, 1191 (11th Cir. 2016). The Eleventh Circuit has briefly summarized that three-step approach as follows:

> Under the *McDonnell Douglas* framework, a plaintiff must first create an inference of discrimination through her prima facie case. *Vessels* [*v. Atlanta Ind. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005)] "Once the plaintiff has made a prima facie case, a rebuttable presumption arises that the employer has acted illegally." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010). "The employer can rebut that presumption by articulating one or more legitimate non-discriminatory reasons for its action." *Id.* "If it does

---

[5] Plaintiff has also arguably sought to hold Strayer liable under Title VII and § 1981 for alleged "harassment" that created a "hostile work environment." To prevail on such a claim, Plaintiff would have to present proof that she was subjected to harassment that was both (1) because of race and (2) so severe or pervasive that it altered the terms and conditions of her employment. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002); *Smelter v. Southern Home Care Servs. Inc.*, 904 F.3d 1276, 1284 (11th Cir. 2018). Plaintiff admits, however, that she cannot satisfy those elements, and she has thus abandoned any potential claim based on a hostile work environment theory. (Doc. 65 at 18, n. 12).

so, the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for discrimination." *Id.*

*Trask*, 822 F.3d at 1191. "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Strayer contends that Plaintiff cannot establish a prima facie case because she has not presented evidence of a comparator, that is, of another Strayer employee of a different race who was alleged to have engaged in similar misconduct to Plaintiff but was not fired. (Doc. 64 at 22-23). Plaintiff broadly asserts, however, that she "was treated more harshly than her White colleagues," (Doc. 65 at 22), identifying three by name: Julie Pryor, Keith Johnson, and Dustin Vick. (*Id.* at 24; *see also* Pl. Aff. ¶¶ 14-16, 18). But to be a valid comparator, an employee outside the plaintiff's protected class treated more favorably must be otherwise similarly situated to the plaintiff in all material respects. *See Lewis v. City of Union City, Ga.*, 918 F.3d 1213 (11th Cir. 2019) (en banc). None of the three white employees Plaintiff cites meets that standard.

With regard to Pryor, Plaintiff laments that she was "not even reprimanded, let alone terminated" despite having allegedly "failed to follow Strayer's policy of

managing an irate student she witnessed making a bomb threat on the college campus." (Pl. Aff. ¶ 18). Plaintiff also complains that Strayer promoted Pryor to the position of Campus Director notwithstanding that she lacked a Master's degree, which Plaintiff says was required. (*Id.*) However, Pryor's qualifications *vel non* for the Campus Director job are beside the point because Plaintiff does not claim she sought or was unlawfully denied that position. Plaintiff also refers the court to no evidence that the supervisor she claims discriminated with regard to her discharge, Dr. Campbell[6] (*see* Doc. 65 at 19 n. 13), was, in fact, Pryor's supervisor or had anything to do with Pryor's selection as Campus Dean. *See Lewis*, 918 F.3d at 1227-28 ("[A] similarly situated comparator … will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff"). Furthermore, Plaintiff does not argue that any Strayer supervisor, whether Dr. Campbell or someone else, was actually aware of Pryor's alleged violation of policy in failing to report the student bomb threat. Absent such

---

[6] It is undisputed that Dr. Campbell did not herself make the final, formal decision on behalf of Strayer to terminate Plaintiff's employment. Rather, Dr. Campbell only made a "recommendation" to do so to her supervisor, Quaye, who, in turn, approved that action. Nonetheless, Plaintiff contends only that it was Dr. Campbell who acted out of racial bias and that it was her recommendation that was the moving force behind the discharge decision. As such, Plaintiff's claim is based on a "cat's paw" theory, which seeks "to hold an employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1335 n. 6 (11th Cir. 2013); *Llampallas v. Mini–Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir.1998); *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 415-16 & n. 1 (2011). While Strayer insists that Dr. Campbell recommended Plaintiff's discharge for entirely lawful, performance-based reasons, Strayer does not question that it could be liable under Title VII and § 1981 if Plaintiff were to establish that Dr. Campbell's recommendation was based on a statutorily prohibited motivation.

knowledge, Strayer's failure to take disciplinary action against Pryor can suggest nothing untoward. *See Jones v. Gerwens*, 874 F.2d 1534, 1542 (11th Cir. 1989) (holding the plaintiff had failed to establish a prima facie case when he could not show his discipliners knew about and consciously overlooked prior rule violations by comparators). Finally, even if a Strayer supervisor knew of and failed to discipline or fire Pryor over the bomb threat, that was still just a single incident. By contrast, Strayer claims that Plaintiff was fired based on a long string of documented performance issues and misconduct, none of which had anything to do with something like a response to an alleged student bomb threat. As such, any comparison between Pryor and Plaintiff would be apples to oranges, precluding Pryor from serving as a comparator.

Plaintiff's comparator arguments related to Johnson and Vick fare no better. Plaintiff claims that, after she was fired, Strayer first assigned Johnson to perform her duties as head of academics at the Huntsville campus and that, sometime in 2016, Strayer moved Johnson to its Birmingham campus and installed Vick in Johnson's place. (*See* Doc. 65-3, Affidavit of Dr. Vidal Adadevoh ¶¶ 8, 10-11). Plaintiff suggests that Strayer treated them more favorably insofar as neither of Johnson nor Vick, unlike Plaintiff, held a Ph.D., which she contends was required to hold the title of "Campus Dean." The court would note that Plaintiff's evidence actually acknowledges that neither Johnson nor Vick actually held that exact title;

rather, due to the lack of a Ph.D., each was only given the title of "Associate Campus Dean." (*Id.*)

But whether Johnson or Vick had a Ph.D. or how their qualifications might stack up relative to Plaintiff's is neither here nor there for purposes of a comparator analysis. Plaintiff doesn't claim she lost out to Johnson or Vick on a promotion to Campus Dean. Nor does Plaintiff claim that Strayer fired her as Campus Dean on an asserted basis that she lacked some degree or another, objective minimum qualification and Strayer then turned around and handed the job to Johnson or Vick despite a similar lack of objective qualification. Rather, it is undisputed that Strayer says it fired Plaintiff for alleged performance deficiencies and misconduct. As further discussed later, Plaintiff has not disputed but perhaps few of the basic facts underlying Strayer's criticism of her performance, even if she does strongly disagrees both with Strayer's interpretation of events and with how Strayer chose to respond. Significantly, however, Plaintiff makes no claim that Strayer might have been aware of any alleged malfeasance on the part of Johnson or Vick, so they do not qualify as comparators for claims alleging disparate discipline.

That being said, the lack of a similarly-situated comparator, however, does not in itself entitle Strayer to summary judgment. While comparator evidence is one way to establish a prima face case in this context, it is not the only way. Another is proof that, following the plaintiff's discharge, she was *replaced* by

someone outside her protected class. *See Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015) (recognizing that, to meet this element of the prima facie case, a plaintiff may show she "was replaced by someone outside the protected class *or* was treated less favorably than similarly situated individuals outside the protected class" (emphasis added)); *Rioux v. City of Atlanta*, 520 F.3d 1269, 1277 (11th Cir. 2008); *Cuddeback v. Florida Bd. of Educ.*, 381 F.3d 1230, 1236 (11th Cir. 2004); *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1290 (11th Cir. 1998). As our court of appeals has explained, "the discharged employee's replacement is an effective gauge of intent because a company's hiring practices may reveal its underlying motivation. Therefore, a hiring procedure that reveals evidence of preference for a nonminority is indicative of discriminatory intent." *Hawkins v. Ceco Corp.*, 883 F.2d 977, 982 (11th Cir. 1989) (footnotes omitted); *see also O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311-13 (1996) (recognizing that proof of replacement by someone "substantially younger" than the plaintiff may lend an inference at the prima facie stage that he was subjected to discrimination because of age in violation of the Age Discrimination in Employment Act).

Plaintiff maintains that she was so replaced, pointing again to the evidence that Strayer hired Johnson and then, a bit later, Vick, both of whom are white, to perform her former responsibilities as head of the academic side of the

administration in Huntsville.  Strayer responds that Johnson and Vick each held the title of "*Associate* Campus Dean."  (Doc. 66 at 13 (emphasis original)).  Strayer suggests that to mean that Johnson and Vick "were hired into a different position serving in a different role with different responsibilities."  (*Id.* (footnote omitted)).  However, Strayer makes no attempt to distinguish the actual duties and responsibilities held by Johnson or Vick as "Associate Campus Dean" from those Plaintiff as the "full" "Campus Dean."  The court thus finds that the evidence would allow an inference that Johnson and/or Vick "replaced" Plaintiff.  *See Hawkins*, 883 F.2d at 982-83; *Rollins v. Techsouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987).

In its reply, however, Strayer argues that the hiring of Johnson and Vick cannot show racially discriminatory intent because, Strayer says, there is no proof that Dr. Campbell, the putative bad actor in the decision to terminate Plaintiff, was also involved in the decisions to hire or assign Johnson or Vick.  (Doc. 66 at 13).  Strayer does not cite any authority for the proposition that a plaintiff seeking to establish a prima facie case through replacement outside the protected class must additionally establish that the replacement decision involved the *same supervisor* who allegedly discriminated against the plaintiff.  None of the cases reviewed by this court in which the Eleventh Circuit has recognized that a plaintiff may establish a prima facie case based on replacement from outside the protected class

appear to have further required such a "same supervisor" showing, at least not expressly. It is thus questionable whether such a requirement exists at the prima facie stage. Indeed, a *McDonnell Douglas* prima facie case is generally conceived as merely a preliminary step whereby a plaintiff need only present evidence of circumstances that are, if otherwise unexplained, sufficient to suggest racial discrimination on the part of the employer such that it is appropriate to require the employer come forward with some evidence that it took the challenged employment action for a lawful reason. *See Young v. United Parcel Serv., Inc.*, ___ U.S. ___, ___, 135 S. Ct. 1338, 1354-53 (2015); *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978).

In the end, however, the court concludes it need not resolve this issue. Because it does not affect the result reached, the court will simply assume that Plaintiff's evidence that she was replaced by Johnson and/or Vick, irrespective of Dr. Campbell's involvement, is sufficient to establish a prima facie case. *See, e.g., Alvarez*, 610 F.3d at 1265; *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007). With that, the burden shifts to Strayer to produce evidence sufficient to indicate that it discharged Plaintiff for one or more reasons other than race. *See Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998). Strayer has clearly done that: Strayer has proffered a declaration from Quaye, who states that she approved Dr. Campbell's recommendation to terminate

Plaintiff's employment based on the alleged misconduct and performance issues enumerated in Dr. Campbell's email dated August 17, 2015.  (*See* Docs. 63-6, 63-15).

The burden thus swings back to Plaintiff to present evidence from which a jury could find that Strayer's proffered explanation is a pretext to hide unlawful race discrimination.  A plaintiff may establish pretext in one of two ways.  She may do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.  "In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Kragor v. Takeda Pharm. Amer., Inc.*, 702 F.3d 1304, 1308-09 (11th Cir. 2012) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)). The Supreme Court has recognized that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. 147-48.  Nevertheless, a plaintiff cannot prevail unless he proves to the jury's satisfaction that unlawful discrimination was the real

reason for the employer's action, not merely that the employer's asserted explanation is false. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

Plaintiff first attempts to show pretext based on circumstantial evidence of racially discriminatory intent. To that end, she again points to the fact that she was replaced by Johnson and/or Vick. As noted above, Plaintiff has proffered that same evidence in an effort to establish an inference of race discrimination at the prima facie stage of *McDonnell Douglas*. It is true that evidence tending to suggest prohibited discrimination as part of a prima facie case may also be used to show pretext. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004). However, Plaintiff's evidence tending to show she was replaced by Johnson and/or Vick, standing alone, does not go far at the pretext stage.

The pretext analysis focuses very pointedly upon the knowledge and motivation of the relevant decision maker in taking the challenged employment action. *See Alvarez*, 610 F.3d at 1253; *Steger v. General Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003). And on that score, Plaintiff claims that the person who discriminated against her because of race in relation to her discharge was Dr. Campbell. However, as Strayer points out, Plaintiff has not presented evidence that Dr. Campbell was involved in a decision to replace Plaintiff with Johnson or Vick. The court has assumed for the sake of argument that Plaintiff need not make such a showing at the prima facie stage. But now that Strayer has come forward

with evidence that it terminated Plaintiff's employment for the lawful reasons set out in Dr. Campbell's recommendation email, to defeat summary judgment, it is incumbent on Plaintiff to counter that with affirmative, probative evidence tending to undercut *Dr. Campbell's* claimed motivation. To that end, if Dr. Campbell didn't hire Johnson or Vick or assign them to replace Plaintiff, then the fact that they replaced Plaintiff would not tend to suggest racially discriminatory intent on Dr. Campbell's part in connection with the earlier discharge of Plaintiff. *See Miles v. Dell, Inc.*, 429 F.3d 480, 489 (4th Cir. 2005) ("[W]hen one individual makes the decision to fire the plaintiff and another makes the replacement hiring decision, the second individual's hiring decision has no probative value whatsoever as to whether the first individual's firing decision was motivated by the plaintiff's protected status."); *also cf. Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("[T]his pattern of firing and demoting so *many* older workers and replacing them with younger workers, *by the relevant decision-maker during the same time period*, constitutes probative circumstantial evidence of age discrimination." (emphasis original); *Lewis*, 918 F.3d at 1227-28 ("[A] similarly situated comparator … will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff"); *Moore v. Sears, Roebuck & Co.*, 464 F. Supp. 357, 366 (N.D. Ga. 1979) (recognizing that a plaintiff might show that the fact that he was replaced by another member of his protected class

was not conclusive of the employer's lack of discriminatory intent through proof "that the decision to fire him was unrelated to the decision to hire his replacement, as might be the case where the choices are made at different levels or by different decisionmakers of a corporate employer"). Here, the only potential evidence that Dr. Campbell made the decision to hire and assign Johnson and/or Vick as Plaintiff's replacement is purely circumstantial. Namely, Dr. Campbell was the supervisor over academics in the region, and she undisputedly recommended to Quaye that Plaintiff be removed from the Huntsville deanship. The court finds it doubtful whether that is enough to allow a non-speculative inference that Dr. Campbell actually participated in the decision to replace Plaintiff with Johnson and/or Vick.

But even if a jury could find Dr. Campbell was responsible for so replacing Plaintiff, that would not be sufficient, standing alone, to show pretext. *See Faircloth v. Herkel Investments Inc.*, 514 F. App'x 848, 851-52 (11th Cir. 2013) (fact that the male plaintiff was replaced by a female in duties as a store general manager was insufficient to show pretext; "At best, this evidence constituted a scintilla, and was insufficient to enable a reasonable jury to find that [the employer] terminated [the plaintiff] because of his sex."); *see also Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1279 (11th Cir. 2002) (holding that a "single shred of evidence" supporting an assertion of pretext was

insufficient, without more, to establish pretext). Were it otherwise, every plaintiff replaced by someone outside the protected class would be entitled to prevail against a motion for summary judgment by the employer, which is obviously not the case. *See, e.g., Cuddeback*, 381 F.3d at 1236 (holding that the plaintiff established a prima facie case based on replacement outside her protected class, but summary judgment for the defendant was proper because the plaintiff failed to establish pretext); *Chambers v. Florida Dep't of Transp.*, 620 F. App'x 872, 879 (11th Cir. 2015) (affirming summary judgment for the employer despite the plaintiff's replacement outside protected class). Rather, to raise a triable issue on pretext, Plaintiff must point to additional, substantial evidence, probative of racially discriminatory intent on the part of Dr. Campbell or tending to suggest that Dr. Campbell's proffered reasons for her recommendation are not worthy of credence. As explained below, the court concludes that Plaintiff has failed to do either.

The court first considers other circumstantial evidence that Plaintiff posits to show to discrimination because of race supporting her claim of pretext. She argues, for example, that "racial discrimination at Strayer is evidenced by peoples' complaints of racial discrimination at Strayer." (Doc. 65 at 19). In support, Plaintiff claims that Hayes complained to Plaintiff that she, that is, Hayes, and Bartlett both felt that the promotion of Pryor to Campus Director was based on the

fact that Pryor is white and that they, Hayes and Bartlett, had not been given an opportunity to apply for the position. Plaintiff says she also complained that the selection of Pryor was racially discriminatory.

But even assuming all of those complaints about Pryor's selection were made, it would not move the needle on pretext. Plaintiff cites no authority to support the notion that *complaints* about race discrimination are themselves *substantive evidence* that race discrimination *actually occurred*. While a complaint may reasonably indicate that the person who made it *believes* the employer took some action based on race, that complaint does not prove anything about whether the employer was, *in fact*, motivated by discrimination. Indeed, by Plaintiff's logic, her act of filing this lawsuit itself constitutes evidence tending to establish that Strayer unlawfully discriminated against her. It doesn't. Plaintiff's argument that complaints about unlawful discrimination tend to show such discrimination in fact is a non-sequitur.

Plaintiff also asserts, however, that Pryor's promotion to Campus Director was actually racially discriminatory, and that such tends to show that Strayer's explanation for why it fired Plaintiff is a pretext to hide such discrimination. The court disagrees. For starters, the admissible evidence Plaintiff offers on Pryor's selection is too meager to raise an inference that it was tainted by race discrimination. The crux of Plaintiff's claim is that Pryor, who is white, was

selected without Hayes and Bartlett, the two African-American Admissions

Officers, having a fair opportunity to apply, despite that, according to Plaintiff,

they were supposedly "more qualified" than Pryor.  However, Plaintiff does not

explain just how Hayes or Bartlett were "more qualified," and to the extent

Plaintiff is merely expressing her own subjective assessment, her beliefs are utterly

irrelevant.  Further, the record shows that no less than *forty-seven* candidates,

including Pryor, applied for the Campus Director vacancy in late March 2015, with

all or nearly all of those coming via the internet.  (Doc. 63-2).  According to

Plaintiff's testimony, she was first told after she returned from an out-of-town trip

"sometime after April of 2015" that the outgoing Campus Director, Anne Price

Jones, had announced at a staff meeting that she was resigning and that Pryor was

going to be assuming her position.  (Pl. Dep. at 142).  As such, it is entirely unclear

how or why Hayes or Bartlett might have believed they were deprived of a chance

to apply.  Indeed, Plaintiff candidly and unambiguously admits in her deposition

that she has no knowledge of circumstances supporting that Hayes or Bartlett

might have, in fact, been deprived of a fair chance to apply for the job.  (*Id*. at 148-

49).  Rather, the only evidence Plaintiff offers about the process and timetable by

which Pryor was selected is Plaintiff's own testimony, which she acknowledges is

all second-hand, based simply on what she was told by Hayes, Pryor, Jackson, and

Jones, none of whom is alleged to have been involved in the decision to pick Pryor.

But even assuming Plaintiff could raise an inference that Pryor's selection as Campus Director was because of race, it would still not aid Plaintiff's pretext case. Again, the pretext inquiry focuses on the actions, knowledge, and motives of the person or persons who made the challenged employment decision. *Alvarez*, 610 F.3d at 1253. Thus, evidence of actions and statements by nondecisionmakers cannot meet the employee's burden. *See Steger*, 318 F.3d at 1079; *Dixon v. Bradshaw*, 212 F. App'x 941, 943 (11th Cir. 2007) (summarily rejecting as "without merit" the plaintiff's suggestion that a particular supervisor's "statements and action demonstrate pretext because [the supervisor] was not a decisionmaker" with respect to the adverse action against the plaintiff). And, again, Plaintiff contends that the bad actor was Dr. Campbell. But there is no evidence that she played any role in the decision to pick Pryor.[7] To the contrary, Plaintiff contends that the person who caused Pryor to be selected at the expense of Hayes and Bartlett was Teri Jaggers, the regional operations manager. (Doc. 65 at 21). But Plaintiff makes no claim and points to no evidence that Jaggers was involved in the

---

[7] Plaintiff has also suggested she was singled out for excessive scrutiny insofar as an audit of the Huntsville campus was scheduled in early August 2015 despite that another audit had been performed in January that year. However, Plaintiff has not directed the court to evidence that Dr. Campbell was responsible for that second audit; that the scheduling of a second audit was, in fact, somehow irregular; or that it was connected to racial bias. It is true that Plaintiff has complained that the audit was set for the same day that Dr. Campbell was to come to campus to review Plaintiff's 2015 mid-year evaluation with her and when they were slated to interview of a potential faculty hire. Plaintiff also laments that Dr. Campbell declined Plaintiff's request to reschedule the performance review meeting and/or the faculty interview for another day. But again, Plaintiff has presented no evidence that Dr. Campbell's refusal in that regard was the result of racial bias.

decision to terminate Plaintiff. So even if Plaintiff could show *Jaggers* was motivated by race on a single occasion to pick Pryor for Campus Director, that would not suggest that *Dr. Campbell* was motivated by race to recommend Plaintiff's discharge to Quaye, which is what matters to pretext. *See Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1257 (11th Cir. 2012) ("[D]ifferences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination." (quoting *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1261 n. 5 (11th Cir. 2001)).

Next, Plaintiff contends that "circumstantial evidence of Strayer's discriminatory motivation is found in the fact that Dr. Campbell fired five (5) Campus Deans in the six months [leading] up to and including the Plaintiff's termination," only one of which was white. (Doc. 65 at 26). Here, Plaintiff refers the court to a chart containing information on 32 Strayer campus deans listed as being under the supervision of Dr. Campbell. (Doc. 65-5). Under the heading of "Employee Status," it lists twenty-six of the deans as "Active"; one as "Leave"; and five, including Plaintiff, as "Terminated." (*Id.*) Under "Ethnicity," it lists eighteen, including Plaintiff, as "Black/African-American"; nine as "White"; four as "Two or More Races"; and one as "Hispanic/Latino." (*Id.*) With respect to the five listed as "Terminated," the chart shows the following additional information

| Name | Campus | Ethnicity | Term. Date | Reason |
|------|--------|-----------|-----------|--------|
| W. Jankel | TX Irving | White | 5/13/15 | "Job Performance" |
| E. Montgomery | GA Cobb | Bl./Afr.-Am. | 8/31/15 | "Policy/CdOfConduct" |
| M. Armstrong | FL Ft. Laud. | Two + Races | 6/15/15 | "Quit/No Reason" |
| P. Camo | GA Lithonia | Bl/Afr.-Am. | 8/31/15 | "Policy/CdOfConduct" |
| Plaintiff | AL Huntsville | Bl/Afr-Am. | 9/03/15 | "Job Performance" |

(*Id.*)  According to Plaintiff, the data on the list evidences "disproportionate termination of non-White deans," because it indicates Dr. Campbell fired them "at a higher rate (17.4%, or 4 out of 23) than Whites (11.1%, or 1 out of 9)."  (Doc. 65 at 26).

Plaintiff's cursory analysis of the chart data discloses no material evidence of race discrimination.  For one thing, the chart itself merely shows that Dr. Campbell was the "Supervisor" of the deans on the list and that five of them were "Terminated."  It does not, contrary to Plaintiff's suggestion, reasonably support that Dr. Campbell herself "fired" those five deans (Doc. 65 at 26), that is, that she actually made the decision or a recommendation to terminate their employment. Indeed, one of the five is listed as having "quit," suggesting a voluntary separation. While it is not disputed that Dr. Campbell made a recommendation to terminate Plaintiff's employment, it is unclear what role, if any, Dr. Campbell might have played in the respective decisions to fire the remaining three deans on the list.

But even assuming Dr. Campbell participated in those termination decisions, it would still leave other glaring problems with Plaintiff's overly-facile approach.

"Statistics without a proper analytic foundation are virtually meaningless." *Burke-Fowler v. Orange Cty., Fla.*, 447 F.3d 1319, 1325 (11th Cir. 2006) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 717 (11th Cir. 2004)).  Plaintiff offers no evidence, expert or otherwise, to explain how the chart data reveals anything of statistical significance.  In addition, the sample size is miniscule.  "While there is no numerical cutoff point for statistical significance, the smaller the sample size, the greater the likelihood that the underrepresentation reflects chance rather than discriminatory practices." *Williams v. Tallahassee Motors, Inc.*, 607 F.2d 689, 693 (5th Cir. 1979).[8]  Thus, "courts have suggested on many … occasions that the 'small universe' to which statistics relate may preclude significant comparisons." *Id.*  Here, it simply is not possible to draw any reasonable inference of racial discrimination from the fact that three or at most four other deans of varying ethnicities were apparently fired for some species of alleged poor performance or misconduct when we know nothing about the underlying circumstances in those few cases.  *See Burke-Fowler*, 447 F.3d at 1325 ("Statistics that merely describe [other] employees as minority or non-minority and disclose whether they were fired or disciplined less severely proves nothing without more information about the particular circumstances involved in each situation."); *Chavez v. URS Fed.*

_____

[8] The decisions of the former Fifth Circuit handed down before October 1, 1981 are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

*Tech. Servs., Inc.*, 504 F. App'x 819, 822-23 (11th Cir. 2013) (statistics indicating

that the defendant fired a higher percentage of female branch managers (fifty

percent, or two of four) than male branch managers (approximately five percent, or

one of twenty-two, did not itself support an inference of sex discrimination); *King

v. Kirkland's Stores, Inc.*, 2006 WL 2239208, at *14 (M.D. Ala. Aug. 4, 2006)

(evidence that eight of eleven employees at defendant's store were African-

American in April 2004 and "far fewer" worked there within two months lacked

any factual context and thus did not allow any inference of pretext with respect to

defendant's explanation that it fired five African-American plaintiffs for alleged

misconduct).

 Plaintiff also attempts to prove pretext based on evidence purportedly

demonstrating that Dr. Campbell's proffered reasons for recommending her

discharge are unworthy of credence.  In so doing, "[Plaintiff] argues at length that

[Dr. Campbell's] complaints about the quality of her work were unfounded, but the

fact that she thinks more highly of her performance than her employer does is

beside the point.  The inquiry into pretext centers on the employer's beliefs, not the

employee's beliefs and, to be blunt about it, not on reality as it exists outside of the

decision maker's head."  *Alvarez*, 610 F.3d at 1266.  Plaintiff insists that she did

the best she could with the difficult situation in which she found herself.  She also

contends that Dr. Campbell would blame her for things, including low campus

enrollment, that were not her primary responsibility. Plaintiff also suggests, upon taking over as Plaintiff's supervisor Dr. Campbell began to create a "paper trail" with the intention of later using it to justify an illegitimate decision to fire Plaintiff. However, neither Plaintiff's laundry list of excuses and explanations offered to downplay her cited shortcomings nor her own repeated expressions that she was a good employee can establish pretext. *See id.*

> Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior."

*Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)).

It might be assumed that Dr. Campbell was overly demanding and that her assessment of Plaintiff's performance was not entirely fair in some general sense. But that's not the issue. Plaintiff cannot show pretext merely by quibbling with the wisdom of Dr. Campbell's thinking. Rather, Plaintiff's instant task is more difficult: she must present sufficient evidence from which a jury could infer that Dr. Campbell did not honestly believe and act upon her stated assessment of Plaintiff. And on that front, Plaintiff has admitted some of the wrongdoing of which she was accused by Dr. Campbell, and she also fails in large part to dispute the underlying facts upon which Dr. Campbell founded her criticisms of Plaintiff.

That is, Plaintiff does not has not genuinely disputed any of the following: (1) that she sent the email publicly discouraging Jackson from leading a team-building exercise, (2) that she sent the text message to Jackson that could have been viewed as warning that she might be fired if she continued to act unprofessionally, (3) that she lied to Campbell about having sent that text message to Jackson when asked about it, (4) that she was not timely aware that Strayer system records showed the Huntsville campus as having failed to advise a large percentage of its at-risk students; (5) that her faculty dashboard showed her with a bottom 10% student opinion rating for classes she taught; (6) that system records indicated she had reopened a low enrollment class in May 2015 without prior approval; (7) that Plaintiff had an outstanding request for a grade change not timely processed; or (8) that Plaintiff had not been timely monitoring and recording development education reports. In the face of all that, Plaintiff has offered nothing in the way of inconsistent or racial statements by Dr. Campbell. Nor has Plaintiff presented evidence of any instance in which Dr. Campbell failed to discipline another employee under her supervision when she had knowledge of materially similar misconduct. Because Plaintiff has failed to establish pretext, Strayer is entitled to summary judgment on the Title VII and § 1981 claims alleging that Plaintiff was discharged because of her race.

**B.    Retaliatory Discharge**

In her other claims, Plaintiff maintains that Strayer is liable under Title VII and § 1981 for having terminated her employment because she complained about race discrimination.  The Title VII claim arises under that statute's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), which makes it an "unlawful employment practice" for an employer "to discriminate against any of his employees …because [the employee] has opposed any practice made an unlawful employment practice by [the anti-discrimination provision of Title VII]."  While § 1981 does not expressly refer to retaliation, it has been interpreted similarly to encompass a cause of action in favor of an employee who claims he was discharged or otherwise subjected to material adverse action in his employment because he made a complaint opposing unlawful race discrimination.  *CBOCS West, Inc.,* 553 U.S. at 446-52.  As with claims alleging substantive discrimination, retaliation claims under Title VII and § 1981 founded upon complaints of race discrimination are deemed to have the same elements and requirements of proof, so they may be analyzed together.  *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008); *Long v. Alabama DHR*, 650 F. App'x 957, 967 & n. 8 (11th Cir. 2016).

Retaliation claims are also subject to analysis using a *McDonnell Douglas*-style burden-shifting framework.  *Jones v. Gulf Coast Health Care of Delaware,*

*LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017). Under it, the plaintiff must first establish a prima facie case by demonstrating (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment decision, and (3) the decision was causally related to the protected activity. *Schaaf v. Smithkline Beecham Corp.*,602 F.3d 1236, 1243 (11th Cir. 2010).

No one questions that Plaintiff's termination is an adverse employment decision. The parties sharply dispute, however, whether Plaintiff has presented admissible evidence of prior statutorily protected activity. The parties agree that a plaintiff may be deemed to have engaged in such activity by virtue of making even informal, verbal complaints reasonably conveying a belief the employer has engaged in prohibited employment discrimination because of race. *See Fucron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016). On that score, Plaintiff points to her affidavit, in which she claims that, when she met with Dr. Campbell on campus on July 9, 2015, she made an explicit, verbal complaint that Strayer's promotion of Julie Pryor to Campus Director that spring had been motivated by racial bias. (Pl. Aff. ¶ 10). Strayer responds by pointing out that Dr. Campbell claims in her own affidavit that Plaintiff made no such complaint to her. (Campbell Aff. ¶¶ 10-16). More importantly, Strayer further insists that Plaintiff's affidavit testimony is a "sham," subject to exclusion at summary judgment on the ground that it allegedly contradicts her prior deposition testimony. *See Fucron*,

843 F.3d at 1306-07; *Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1986); *Van T. Junkins & Assocs. v. U.S. Indus.*, 736 F.2d 656 (11th Cir. 1984).

However, because the exclusion issue is not that easily resolved and because it does not affect the outcome of the motion for summary judgment, the court will merely assume that Plaintiff's affidavit testimony that she complained about Pryor's promotion on racial grounds is admissible for present purposes. That testimony would establish protected activity. The court will further assume that Plaintiff can also establish an inference of causation, and thus a prima facie case of retaliation, based on the fact that Plaintiff's putative complaint to Dr. Campbell occurred on July 9, 2015, and Dr. Campbell sent her email to Quaye recommending Plaintiff's termination on August 17, 2015, less than six weeks later. *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010) ("[T]emporal proximity alone is sufficient to establish an inference of retaliation" when that proximity is "very close."); *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (seven weeks sufficiently close to create causal nexus).

However, based on the same evidence by which Strayer met its intermediate burden under *McDonnell Douglas* with regard to Plaintiff's race discrimination claims, Strayer has likewise met that burden on Plaintiff's retaliation claims. That is, Strayer has referred to Quaye's affidavit, in which she states that she decided to

approve Dr. Campbell's recommendation to terminate Plaintiff's employment based on the reasons set forth in Dr. Campbell's email dated August 17, 2015. The question then, is whether Plaintiff can show that Strayer's proffered explanation for why it fired Plaintiff is a pretext to hide a retaliatory animus.

Because Plaintiff is still claiming that it was Dr. Campbell who acted out of a prohibited animus, this time stemming from Plaintiff's supposed complaint about racial bias in Pryor's promotion, it is still only Dr. Campbell's knowledge, statements, and actions that are relevant to the pretext inquiry. On that front, the only significant evidence of pretext is again the close temporal proximity between Plaintiff's alleged complaint to Dr. Campbell on July 9th and Dr. Campbell's email to Quaye on August 17th that recommended Plaintiff's termination, which was formally communicated to Plaintiff on September 3d. For example, there is no allegation that Dr. Campbell made any statements, whether verbally or in writing, to Plaintiff or anyone else, indicating that she, Campbell, harbored a bias against Plaintiff because of her complaint about the selection of Pryor. Indeed, despite much correspondence and documentation in the record from Dr. Campbell as it relates to Plaintiff, none of those writings at all acknowledges the receipt of any complaint from Plaintiff about race discrimination. And, again, it should be noted that Plaintiff does not claim, and there is no evidence, that Dr. Campbell was involved in Pryor's selection. Therefore, one could not reasonably infer that

Plaintiff's alleged complaint to Dr. Campbell might have been construed by her as an accusation or complaint of racial bias against her *personally*.

To be sure, Plaintiff supposes that Dr. Campbell's assertions of Plaintiff's allegedly poor work performance are, on the whole, unfair, unwarranted, and a pretext to hide a prohibited animus. However, none of Dr. Campbell's particular criticisms could themselves be product of a retaliatory animus insofar they occurred and were noted prior to when Plaintiff allegedly made her discrimination complaint on the afternoon of July 9th. Indeed, that covers most of the problems Dr. Campbell raises about Plaintiff's work performance as recounted in her recommendation email, including those dealing with (1) an April 15th email related to concerns about the advising of students, (2) a change of attendance email, also from April 2015, (3) the email from May 2015 related to the reopening of a low-enrollment class; (4) an April 2015 email about a delay in processing a grade-change request; (5) the investigation into Plaintiff's text message to Jackson, which Plaintiff *admittedly lied* about sending; and (6) the issue with Jackson's June 30th email suggesting a team exercise. When "gradual adverse actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slatter v. Swiss Reinsurance Amer. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001). And, again, the big picture is that Plaintiff by and large admits the existence of the facts upon which Dr. Campbell indicates were the basis for her

criticism of Plaintiff's work performance, even if Plaintiff disagrees with how Dr. Campbell interpreted those facts or reacted to them. Finally, Plaintiff has not identified any other employee who was alleged to have engaged in similar misconduct, did not engage in protected activity, and received more favorable treatment. The court concludes that Plaintiff has failed to create a question of fact relative to pretext on the retaliation claims. Strayer's motion for summary judgment will therefore also be granted as to the retaliation claims.[9]

## IV.    CONCLUSION

Based on the foregoing, Strayer's motion for summary judgment (Doc. 62) is due to be **GRANTED**. A separate final order will be entered.

**DONE**, this 29th day of April, 2019.

_____

**JOHN E. OTT**
Chief United States Magistrate Judge

---

[9] Strayer has also argued that Plaintiff's damages and remedies on her claims are due to be limited because Strayer asserts that it would have fired Plaintiff in any event based on evidence discovered in this litigation. Specifically, Strayer contends that Plaintiff allegedly lied on her application about her prior salary and reason for leaving her job. *See McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352 (1995); *Holland v. Gee*, 677 F.3d 1047, 1064-65 (11th Cir. 2012). However, because the court is granting Strayer's motion for summary judgment in full, the court need not address such issues of after-acquired evidence.